No. 90-106

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

STEER, INC.,

      Plaintiff and Respondent,

v.

THE DEPARTMENT OF REVENUE OF
THE STATE OF MONTANA,

      Respondent and Appellant.



APPEAL FROM:   District Court of the First Judicial District,
               In and for the County of Lewis and Clark,
               The Honorable Dorothy McCarter, Judge presiding.


COUNSEL OF RECORD:

      For Appellant:

           Eric J. Fehlig, Esq., Department of Revenue, Helena,
           Montana

      For Respondent:

           Bryan L. Asay, Esq., Kelley & Asay, Helena, Montana


Submitted:   October 25, 1990

Decided:   December 11, 1990

Filed:

Chief Justice J. A. Turnage delivered the Opinion of the Court.

The Department of Revenue (DOR) appeals an order of the First Judicial District Court, Lewis and Clark County, which granted tax-exempt status to cattle owned by Steer, Inc. (Steer), on the basis that the cattle were property owned by an "institution of purely public charity" under §§ 15-6-201(1)(e), and -201(2)(a), MCA. This holding reversed a prior decision of the State Tax Appeal Board (STAB). We reverse the District Court's order.

DOR raises the following issues:

1. Did the District Court err in finding STAB's Findings of Fact IX and XI clearly erroneous?

2. Did the District Court err by failing to remand the case to STAB for suitable findings when it found STAB's Findings of Facts IX and XI clearly erroneous?

3. Did the District Court err when it held that tax-exempt property of an institution of purely public charity need only be owned, and not used, by the institution?

4. Did the District Court err when it found that the requirements of a purely public charity did not preclude uses that are significantly non-charitable in nature?

5. Did the District Court hold that the dissemination of religious teachings is a charitable purpose qualifying the institution for a property tax exemption, and if so, was this an error?

6. Did the District Court err when it found that the production of revenue from property is a charitable purpose qualifying the institution for a property tax exemption?

7. Did the District Court err when it found that the beneficiaries of an institution of purely public charity do not have to be persons who would otherwise be the recipients of aid from local or state Montana governments?

FACTS

Steer, a non-profit North Dakota corporation, conducts a stewardship program that raises funds, and in turn, donates these funds to member evangelical organizations. This unique stewardship program, which originated in 1956 and is currently operating in twenty-eight states, creates a three-way partnership between a donor, a farmer, and a member evangelical organization.

A donor contributes $600.00 increments to Steer, and receives a one-time tax deduction for the charitable contribution. Steer then purchases a livestock unit with each $600.00 contribution.

Steer places the livestock unit with a farmer. The farmer agrees to provide free feed and care to the livestock unit, as well as its offspring. The farmer sells the livestock's offspring in Steer's name, and forwards all of the profits from the sale to Steer. The farmer's costs associated with the care of the livestock unit are tax deductible.

3

Steer then donates all profits, less twenty-seven percent for administrative and insurance costs, to a member evangelical organization, which can be designated by the donor or farmer. To be a member, an evangelical organization must complete an application and be approved by Steer's Board of Directors. Once selected, the member evangelical organization must pay Steer an annual membership fee.

The livestock unit is reinvested in this stewardship program and continues to yield profit which is donated to member evangelical organizations until it is too old to produce. The old livestock is then culled and sold, whereby, again, all sale profits go to Steer for distribution to member evangelical organizations. Steer currently has approximately 100 head of cattle in Garfield County, Montana.

From 1982 to 1987, Garfield County's Assessor classified Steer's then approximate seventeen cattle as taxable property under § 15-6-136, MCA, and assessed Steer $485.92 in taxes. Steer appealed to the Garfield County Tax Appeal Board for a refund on April 22, 1987--this appeal was denied. On June 29, 1987, Steer further appealed to STAB.

On January 30, 1989, STAB denied Steer's appeal on the basis that Steer did "not advance a charitable purpose. The evidence establishes that the cattle are raised and sold for a profit. The profit is used to advance and further evangelical gospel and doctrine."

Steer petitioned for judicial review on March 24, 1989. On December 18, 1989, the District Court reversed and remanded STAB's decision, and held that Findings of Fact IX and XI were clearly erroneous:

> Steer, Inc. objects to STAB's Finding of Fact IX which states that "[e]ach missionary recipient has as its principal purpose the dissemination of evangelical gospel and principles." Because this finding ignores its commitment to providing services and goods to the needy, Steer, Inc. argues, it shows that STAB failed to look beyond the religious aspect of Steer Inc.'s organization. STAB also found in Finding of Fact XI that "[t]he evidence in the case establishes that the cattle and the property owned by Steer, Inc. are not used for any purpose other than the purposes set forth in the Findings of Fact above." These findings are clearly erroneous based upon the evidence on the record.

The District Court further stated that STAB ignored testimony that stated that Steer's funds were used in projects "that were charitable rather than strictly evangelistic" such as a hospital construction and educational contributions. From this decision, DOR appeals.

## STANDARD OF REVIEW

We recognize that in the past this Court has interpreted § 2-4-704, MCA, the standards for judicial review of an administrative ruling, to mean that an agency's findings of fact are subject to a "clearly erroneous" standard and agency's conclusions of law are subject to a broader "abuse of discretion" standard. City of

5

Billings v. Billings Firefighters (1982), 200 Mont. 421, 430, 651 P.2d 627, 632; P.W. Berry Co., Inc. v. Freese (1989), 239 Mont. 183, 188, 779 P.2d 521, 524 (citations omitted). "[A] finding is 'clearly erroneous' when, although there is evidence to support it, a review of the record leaves the court with the definite and firm conviction that a mistake has been committed." Wage Appeal of Montana State Highway Patrol Officers v. Board of Personnel Appeals (1984), 208 Mont. 33, 40, 676 P.2d 194, 198 (citations omitted). "Appellants carry the burden of showing prejudice from a clearly erroneous decision." Terry v. Board of Regents of Higher Education (1986), 220 Mont. 214, 217, 714 P.2d 151, 153 (citations omitted). An agency's conclusions of law will be reversed for abuse of discretion "[w]here it appears that the legislative intent is clearly contrary to agency interpretation." Billings Firefighters, 200 Mont. at 431, 651 P.2d at 632.

In the future, we will continue to use the "clearly erroneous" standard for reviewing findings of fact. However, in reviewing conclusions of law, our standard of review will be merely to determine if the agency's interpretation of the law is correct, instead of applying the inappropriate abuse of discretion standard.

In the past, we have applied this standard when reviewing conclusions of law of the Workers' Compensation Court. See Sharp v. Hoerner Waldorf Corp. (1978), 178 Mont. 419, 423, 584 P.2d 1298, 1301; Wassberg v. Anaconda Copper Company (1985), 215 Mont. 309, 315, 697 P.2d 909, 912; Schaub v. Vita Rich Dairy (1989), 236 Mont.

389, 391, 770 P.2d 522, 523. The reasoning for simply determining if the court's conclusions are correct is that no discretion is involved when a tribunal arrives at a conclusion of law--the tribunal either correctly or incorrectly applies the law. For that reason, this Court concludes that our standard of review relating to conclusions of law, whether the conclusions are made by an agency, workers' compensation court, or trial court, is whether the tribunal's interpretation of the law is correct.

Our standard of review relating to conclusions of law is not to be confused with our review of discretionary trial court rulings. This has been defined as "encompassing the power of choice among several courses of action, each of which is considered permissible." See Aldisert, The Judicial Process, 1976, page 759.

Such rulings are usually trial administration issues, scope of cross-examination, post-trial motions, and similar rulings. The standard of abuse of discretion will be applied to these rulings.

ANALYSIS

Because we find reversible error involving two of the seven issues presented on appeal, we will limit our discussion to 1) whether the District Court erred in finding STAB's Findings of Fact IX and XI clearly erroneous, and, 2) whether the District Court erred when it held that tax-exempt property of an institution of purely public charity need only be owned, and not used, by the institution.

7

1.  Did the District Court err in finding STAB'S Findings of Fact IX and XI clearly erroneous?

STAB's Findings of Fact IX and XI read as follows:

IX
Each missionary recipient has as its principal purpose the dissemination of evangelical gospel and principles.

XI
The evidence in the case establishes that the cattle and the property owned by Steer, Inc. are not used for any purpose other than the purposes set forth in the Findings of Fact above.

DOR asserts that the District Court incorrectly found Findings of Fact IX and XI clearly erroneous because contrary to the District Court's holding, STAB did not ignore the fact that Steer, in part, supports charitable projects. Rather, DOR argues that STAB correctly found that Steer's member evangelical organizations' principal purpose is to disseminate evangelical gospel and principles. "Principal," here, does not mean "exclusive"--STAB used the word "principal" to put into perspective Steer's religious activities compared to its charitable activities.

Additionally, DOR argues that STAB's Finding of Fact XI properly distinguishes that when considering whether personal property is tax-exempt under Mont. Const. art. VIII, § 5(1), and §§ 15-6-201(1)(e) and -201(2)(a), MCA, it is the use of the personal property and not the ownership that is determinative. Here, DOR argues that Steer used its cattle exclusively as a capital investment for the production of revenue, which in turn,

8

was donated to member evangelical organizations--Steer was not directly using the cattle as a source of food for the needy.

Finally, DOR argues that the record is void of evidence that Steer was prejudiced by STAB's decision or that STAB made a mistake. Accordingly, DOR argues that the District Court had no basis to find Findings of Fact IX and XI clearly erroneous in light of Terry and Wage, supra.

We agree with DOR's arguments. The record indeed contains substantial evidence to support STAB's finding that Steer's member evangelical organizations' principal purpose was the dissemination of evangelical gospel and principles. This finding does not ignore the fact that Steer conducts charitable activities; it does, however, properly balance its charitable activities in relation to its primary, religious activities. Furthermore, we agree with DOR that when considering tax-exempt status, it is the use of the property that is determinative rather than the ownership of the property. See Flathead Lake Methodist Church Camp v. Webb (1965), 144 Mont. 565, 570, 399 P.2d 90, 93. Steer exclusively used the cattle as a capital investment to produce funds, which in turn, were donated to member evangelical organizations that provide beneficial services to the needy; Steer did not directly use the cattle to feed needy people. Finally, we hold that STAB's decision did not prejudice Steer and the record does not reveal that STAB made a clearly erroneous mistake. Therefore, based on the standards of review under Terry and Wage, the District Court

9

incorrectly found STAB's Findings of Fact IX and XI clearly erroneous.

2. Did the District Court err when it held that tax-exempt property of an institution of purely public charity need only be owned, and not used, by the institution?

Steer, through its innovative stewardship program, provides a valuable service by raising funds which, in turn, are donated to needy people world-wide. However, the fact that Steer's unique fund-raising method produces worthwhile results through its member evangelical organizations does not negate its tax obligations under Montana constitutional and statutory mandate. We have already held that Steer's use of its cattle as a capital investment was determinative in deciding that it did not qualify for a tax-exemption based on being an "institution of purely public charity." We feel, however, that this case requires us to further clarify "institutions for purely public charity."

In order to receive tax-exempt status, Steer's cattle must qualify as "institutions of purely public charity" under Mont. Const. art. VIII, § 5(1), and §§ 15-6-201(1)(e) and -201(2)(a) MCA,

The primary focus is whether "institution" means entity or property.

Mont. Const. art. VIII, § 5(1) provides:

(1) The legislature <u>may exempt</u> from taxation:

10

(a)  Property of the United States, the state, counties, cities, towns, school districts, municipal corporations, and public libraries, but any private interest in such property may be taxed separately.

(b)  Institutions of purely public charity, hospitals and places of burial not used or held for private or corporate profit, places for actual religious worship, and property used exclusively for educational purposes.

(c)  Any other classes of property.  [Emphasis added.]

Section 15-6-201(1)(e), MCA, provides:

(1)  The following categories of property are exempt from taxation:

. . .

(e)  institutions of purely public charity [Emphasis added].

Section 15-6-201(2)(a), MCA, provides:

(2)(a)  The term "institutions of purely public charity" includes organizations owning and operating facilities for the care of the retired or aged or chronically ill, which are not operated for gain or profit.

Exemptions from property taxation are to be strictly construed.  Cruse v. Fischl (1918), 55 Mont. 258, 265-66, 175 Pac. 878, 881; Town of Cascade v. Cascade County (1926), 75 Mont. 304, 308, 243 Pac. 806, 807; Flathead Lake Methodist Camp v. Webb (1965), 114 Mont. 565, 573, 399 P.2d 90, 94-95; Old Fashion Baptist Church v. Montana Dep't of Revenue (1983), 206 Mont. 451, 455, 671 P.2d 625, 627.  Taken together, the Montana Constitution and the Montana legislative acts intend "institutions" to mean property or

11

place employed for purely public charitable purposes or activities rather than an entity. The cattle are property and tax is imposed on property. If it is charitable property in its purpose and employment and not for profit or gain of income, taxes are not imposed. Here, the cattle's employment was for the gain of income, and therefore, the cattle are taxable.

Mont. Const. art. VIII, § 5(1) provides that the legislature _may_ exempt property from taxation. The exemptions of property from taxation is clearly left to the discretion of the legislature and as noted, are to be strictly construed. The history and provisions of § 15-6-201, MCA, reflect the many times when this section of the code has been amended to add property to the list of exempted items, which includes such items as residences of the clergy to a bicycle used for personal transportation of the owner. The judiciary may not add livestock to the list of exemptions. Accordingly, we reverse the District Court and hold that Steer's cattle do not qualify as "institutions of purely public charity," and therefore, are not tax-exempt.

Reversed.

J. A. Turnage
Chief Justice

12

We concur:

_John Conway Harrison_

_Diane G. Barz_

_William E. Hunt_

_R. C. McDonough_
　　　　　Justices

13

Justice John C. Sheehy, dissenting:

The majority take a very narrow view of the charitable exemption from taxation provided by our State Constitution and our statutes. The majority interpretation of that exemption gives it a twist that will certainly be a troublemaker in the future.

First, we must recognize that the constitutional and legislative language is imprecise. Montana Constitution, Art. VIII, § 5(1)(b), provides:

> (1) The legislature may exempt from taxation:
>
> . . . (b) Institutions of purely public charity, hospitals and places of burial not used or held for private or corporate profit, places for actual religious worship, and property used exclusively for educational purposes.

With regard to the meaning of the constitutional exemption for purely public charity institutions, the intent is open to argument. While other clauses of the constitutional permission for tax exemptions refer to <u>property</u> of the entities, with respect to charity organizations it merely exempts "institutions." It could be argued and some members of this Court think that the exemption is only to the "<u>institution</u>" as an entity, and not to the property of the institution. That position is akin to arguing that the taxation exemption is applicable to an abstraction, the entity, and not to its property, which has a physical existence.

The majority Opinion rejects that argument, holding that the Constitution and the legislature intended "institutions" to mean property or place and not the entity itself. That position, of course, is correct. Having reached the proper interpretation of

14

the imprecise language, however, the majority then reverse their logic, holding that the entity's property is taxable. On the one hand, the majority hold that the property of an institution is what is intended to be exempted though held by a purely public charity; on the other hand, they take away that exemption by holding the property of such an institution is taxable.

What that position means for other property held by purely public charities is threatening. One can think of examples. If a donor gives shares of corporate stock to a purely public charity, and the charity holds the stock for income to accomplish its purposes, under the logic of the majority the stock itself is taxable as property, unless other statutory provisions intervene. The donor of a bed to a purely public charity, to be used by the charity to acquire income for the charity's purposes would find the bed also taxable, although in Bozeman Deaconess Foundation v. Gallatin County (1968), 151 Mont. 143, 439 P.2d 915, this Court held that such property was not taxable. (Of course, a bed in a charity organized for the care of the retired, the aged or the chronically ill is specifically exempted under § 15-6-201(2)(a), MCA, but what of a bed used by a charity to gain funds for the homeless or needy transients?)

Judge McCarter, sitting in the District Court in this case, saw the issue quite clearly. She said: "The question is whether Steer, Inc. is a purely charitable organization pursuant to § 15-6-201(1)(e), MCA. Necessarily, the definition of a purely charitable organization is crucial to answering this question." Such a simple and direct statement of the issue, if followed by the

15

majority, would have led to a correct conclusion. If the institution is truly a purely charitable organization, it and its property are entitled to exemption from taxation as intended, I submit, by the constitutional framers and the legislature.

The fact that the charity holds its property to gain income which in turn is used for charitable purposes should not destroy the exemption. This Court indicated that solution in Bozeman Deaconess Foundation v. Gallatin County, supra, 151 Mont. at 148. This Court said:

> To qualify as a charity does not require that it have an exclusive relationship to the poor, and its charitable status is not destroyed by the charging of fees for admission and maintenance. The case of Frederica Home for the Aged v. San Diego County, 35 Cal.2d 789, 221 P.2d 68, summarizes the modern view of these points:

> "The concept of charity is not confined to the relief of the needy and destitute, for 'aged people require care and attention apart from financial assistance, and the supply of this care and attention is as much a charitable and benevolent a purpose as the relief of their financial wants.' (Citing case.) So the charge of fees by such an institution as a home for the aged will not necessarily prevent its classification as charitable if such sums 'go to pay the expenses of operation and not to the profit of the founders or shareholders,' for all persons may 'under certain conditions be proper objects of charity.' (Citing cases.)"

> . . .

> These same authorities demonstrate that neither its public nature nor its standing as a charity is destroyed by the admission requirements imposed. Such requirements apply to all of a particular class and are consistent with charitable methods, motives and purposes.

No one can demonstrate for me a substantial difference between charging fees by an institution in its home for the aged (which fees go to pay the expenses of operation and not to the profit of the founders or the shareholders) and the holding of property by

16

such a charitable organization to gain income, which in turn "go[es] to pay the expenses of operation and not to the profit of the founders and shareholders." Indeed, there is no difference. Bozeman Deaconess, supra.

The proper rule in this case should be that once an institution is shown to be one of purely public charity, without dispute, then its property, of whatever kind, is not subject to taxation under the exemption granted by the Constitution and our legislature.

On another point, the Department of Revenue has argued strenuously that the purpose of Steer, Inc. in the use of its property in this case was to disseminate its religion, and that therefore the plan violated the First Amendment if a tax exemption were granted. The majority opinion is silent on this subject, and I hope by implication, quite properly, rejects that contention. The Department argued that dissemination of religion was the "principal" objective of Steer, Inc. in its plan. STAB, in its Finding of Fact No. IX stated that: "each missionary recipient has as its principal purpose the dissemination of evangelical gospel and principles." On that basis, the Department claimed that the First Amendment was violated. The District Court disagreed with the Department's contention, pointing out that there was substantial testimony from Steer, Inc. about how its funds were used by its member organizations and that charitable purposes other than the dissemination of religion were involved. There is no reason to deny the exemption even though the "charity may be devoted to bringing people into religious influence," as long as

17

the funds are truly used for what all recognize as charitable purposes not necessarily bound by religion, the aid of the poor, the homeless, the aged, the ill, and the misfortunate. Flathead Lake Methodist Camp v. Webb (1965), 144 Mont. 565, 399 P.2d 90.

Another argument of DOR of no merit is its contention that the tax exemption should not be allowed if the charitable activities take place out of Montana. DOR is in the farcical position of claiming a parochial reason for its anti-parochial stance.

It is my view that the District Court should be affirmed.

John C. Sheehy
Justice

18

Justice Fred J. Weber dissents as follows:

I join in all aspects of the dissent of Justice Sheehy. In addition to the elements of his dissent, I desire to comment on a fundamental aspect of the majority opinion.

The majority opinion in Issue 1 concludes that STAB's Findings of Fact IX and XI are correct, and therefore overrules the conclusion of the District Court. In substance Finding of Fact IX found that each missionary recipient to whom Steer, Inc. contributed had as its principal purpose the "dissemination of evangelical gospel and principles." In substance Finding of Fact XI concluded that the cattle and property owned by Steer, Inc. were not used for any other purpose than set forth above in the Findings of Fact. The conclusion of fact to be drawn from these two Findings is that STAB found that the cattle owned by Steer, Inc. were used for the principal purpose of the dissemination of evangelical gospel and principles. The substance of the majority opinion comment on this aspect is as follows:

> . . . Rather, DOR argues that STAB correctly found that Steer's member of evangelical organizations' <u>principal purpose is to disseminate evangelical gospel and principles.</u> "Principal" here does not mean "exclusive"--STAB used the word "principal" to put into perspective <u>Steer's religious activities compared to its charitable activities.</u>
>
> . . .
>
> We agree with DOR's arguments. The record indeed contains substantial evidence to support STAB's finding that Steer's member evangelical organizations' principal purpose was the dissemination of evangelical gospel and principles. This finding does not ignore the fact that Steer conducts charitable activities; it does, however, properly <u>balance its charitable activities in relation</u>

19

<u>to its primary, religious activities.</u> . . . (Emphasis supplied.)

STAB bases its entire analysis on an invalid assumption that religious activities cannot be charitable. The majority opinion has fallen into the same error when it concludes that the Finding properly balances the charitable activities of STAB in relation to its primary, religious activities. To state the conclusion in a different way, the assumption is that charitable activities cannot include religious activities. The assumption that charitable principles or purposes somehow exclude religious principles or purposes is incorrect.

In order to demonstrate that the assumed contradiction is not correct, I will review some basic Christian religious principles. The gospel according to Matthew, Chapter 25 starting at verse 31 (Revised Standard Version of the Bible) describes the last judgment when Jesus Christ returns:

> When the Son of man [Jesus Christ] comes in his glory, and all the angels with him, then he will sit on his glorious throne. Before him will be gathered all the nations, and he will separate them one from another as a shepherd separates the sheep from the goats, and he will place the sheep at his right hand, but the goats at the left. Then the King [Jesus Christ] will say to those at his right hand, "Come O blessed of my Father, inherit the kingdom prepared for you from the foundation of the world; for I was hungry and you gave me food, I was thirsty and you gave me drink, I was a stranger and you welcomed me, I was naked and you clothed me, I was sick and you visited me, I was in prison and you came to me." Then the righteous will answer him, "Lord, when did we see thee hungry and feed thee, or thirsty and give thee drink? And when did we see thee a stranger and welcome thee, or naked and clothe thee? And when did we see thee sick or in prison and visit thee?" And the King will answer them, "Truly, I say to you, as you did it to one of the least of these my brethren, you did it to me."

From the foregoing, we may conclude that a principle of Christianity is that Jesus Christ will judge Christians upon the manner in which they treat the least of people. More specifically, the gospel establishes the religious principle that Christians are to feed the hungry, to give drink to the thirsty, to clothe the naked, to visit the sick and those in prison. We may therefore conclude that the feeding of the hungry, the clothing of those without clothes, and the caring for the sick are essential principles of the Christian religion. Note that these also constitute charitable activities.

The evidence in this case with regard to the religious basis for the activities of Steer, Inc. and the missionary recipients was all presented by Steer, Inc. No contrary information was presented by any opposing parties. It is true the evidence did establish that Steer, Inc. as well as the missionary recipients have a strong set of Christian principles which motivate and guide them. As I trust appears from the foregoing gospel quotation, the obligation felt by believers in Christianity that they are to feed the hungry, clothe the naked, and care for the sick and visit those in prison does not convert those activities into some form of religious activity which thereby becomes a non-charitable activity.

This is recognized in the holdings of the District Court which are now reversed by the majority opinion. The District Court pointed out that Finding of Fact IX ignored the commitment to provide services and goods to the needy by STAB's failure to look beyond the religious aspect of the organization. The District

Court correctly saw that religious activities can also properly be charitable activities, and that charitable activities can of course include religious activities, such as providing for the needy.

In accord with the above described Christian religious principles, Mother Theresa and a number of women working with her provide food, clothing and shelter for the poorest of the poor in cities throughout the world. They do so based upon the above quoted gospel principle that when they do this for the least of human beings, they are doing it for Jesus Christ. Would those religious principles disqualify their charitable activities from tax exemption?

In his dissent, Justice Sheehy has clearly set forth the error on the part of the majority in assuming that the property of an institution of public charity is subject to tax. I conclude that the majority also makes a foundational error when it assumes that religious principles of Steer, Inc. and its missionary recipients disqualifies their activities from being classed as charitable.

I too would affirm the District Court.

_____
                        Justice


Justice John C. Sheehy joins in the foregoing dissent.

_____
                        Justice